UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



...........................................................................................

HOWARD JACKSON, KENNETH UDEMEZUE, ANDRE
JOHNSON, BRANDON BONNER, LONNIE PEARSON,
KELENA TATE, ABC REAL ESTATE SERVICES, INC.,
and SANTOS REALTY, INC.,

Plaintiffs,

v.

AMERICAN PLAZA CORP., CITY ROOMS, INC.,
CORONADO SIGUE MULTI-SERVICE INC., EASY
ROOM RENTALS, ERR NYC LLC, FLASH RENTALS,
J.A.H. ROOMS FOR RENT, MYNEWROOMMATE, INC.,
and HANS GABRIEL VOLTAIRE A/K/A LOUIS SOLIS,
NEW HABITAT SOLUTIONS, NYC ROOMS FOR RENT,
INC., NYGORENTALS.COM and SQUARE FOUR REALTY,
RENTASY RENTALS, INC., and SOOL REALTY CORP.

Defendants.

...........................................................................................X

**COMPLAINT**

**JURY TRIAL
DEMANDED**



OCT 20 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Howard Jackson ("Black Tester 1"), Kenneth Udemezue ("Black Tester

2"), Andre Johnson ("Black Tester 3"), Brandon Bonner ("Black Tester 4"), Lonnie

Pearson ("Black Tester 5"), Kelena Tate ("Black Tester 6"), ABC Real Estate Services,

Inc., and Santos Realty, Inc., as for their complaint against the defendants, allege as

follows:

**NATURE OF ACTION**

1.       This is a civil action for declaratory relief, injunctive relief, compensatory

damages, punitive damages, and attorneys' fees brought on behalf of plaintiffs Black

Tester 1, Black Tester 2, Black Tester 3, Black Tester 4, Black Tester 5, and Black Tester

6, fair housing testers, and ABC Real Estate Services, Inc. and Santos Realty, Inc., real

estate brokers that deal in rooms for rent, under (i) Title VIII of the Civil Rights Act of 1968, as amended, 42 USC § 3601, *et seq.* (the "Fair Housing Act"), (ii) the New York Real Property Law, Article 12-C, § 444-a *et seq.*, (iii) New York Executive Law § 296(5)(a) (the "New York Human Rights Law"), (iv) New York City Administrative Code § 8-107 (the "New York City Human Rights Law"), (v) New York General Business Law § 349, and (vi) for breach of contract under the Terms of Use of Craigslist.org ("Craigslist"), to redress violations of law in the advertising of room rentals on Craigslist. Plaintiffs allege that defendants, all purported room rental agencies offering rooms for rent in the Southern District of New York, posted facially discriminatory advertisements on Craigslist and/or engaged in active discrimination and racial steering of applicants in violation of the Fair Housing Act and New York law. Defendants also posted multiple listings for the same rental properties ("spamming") on Craigslist, in violation of Craigslist's Terms of Use, in order to prevent plaintiffs ABC Real Estate Services and Santos Realty Inc.'s advertisements from being seen by the public. Finally, many defendants posted facially misleading advertisements on Craigslist, holding themselves out to be licensed by the State of New York as real estate brokers when in fact such licenses had never been obtained or had been revoked or suspended due to prior misconduct.

## JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 42 USC §§ 3601, 3604, and 3613, as well as 28 USC §§ 1331 and 1343(a)(4). Plaintiffs Black Tester 1, Black Tester 2, Black Tester 3, Black Tester 4, Black Tester 5, and Black Tester 6 have standing to bring this action as "aggrieved persons" under 42 USC § 3602(i).   This Court

has supplemental jurisdiction over the New York State and New York City law claims, and the California law claims, pursuant to 28 USC § 1367.

3.          Venue is proper in the Southern District of New York because many defendants reside in this district, and a substantial part of the events giving rise to this complaint occurred in this district.

## THE PARTIES

4.          Plaintiff ABC Real Estate Services, Inc., is a domestic corporation organized under the laws of the State of New York, is engaged in the business of room rental information vending, and maintains its place of business in King's County, State of New York.  ABC Real Estate Services, Inc.'s broker of record, Dylan Williams, is licensed by the New York State Department of State ("Department of State").

5.          Plaintiff Santos Realty, Inc., is a domestic corporation organized under the laws of the State of New York, is engaged in the business of room rental information vending, and maintains places of business in Bronx County and Westchester County, State of New York.  Santos Realty, Inc.'s broker of record, Fatima Santos, is licensed by the Department of State.

6.          Defendant American Plaza Corp. is a domestic corporation organized under the laws of the State of New York.  Upon information and belief, American Plaza Corp. maintains an office at 3834 Broadway, New York, New York 10032.

7.          Defendant City Rooms, Inc,. is a domestic corporation organized under the laws of the State of New York.  Upon information and belief, City Rooms, Inc., maintains an office at 60 West 22nd Street, New York, New York 10010.

3

8.        Defendant Coronado Sigue Multi-Service, Inc., is a domestic corporation organized under the laws of the State of New York.  Upon information and belief, Coronado Sigue Multi-Service, Inc., maintains an office at 2404 Amsterdam Avenue, New York, New York 10033.

9.        Defendant ERR NYC LLC is a limited liability company registered with the Department of State.  Upon information and belief, ERR NYC LLC maintains an office at 2185 1st Avenue, New York, New York 10029.

10.       Defendant Easy Room Rentals is, upon information and belief, an entity not registered with the State of New York.  Upon information and belief, Easy Room Rentals does business at 37-69 80th Street, Suite 205, Queens, New York 11372.

11.       Defendant Flash Rentals is, upon information and belief, an entity not registered with the State of New York.  Upon information and belief, Flash Rentals does business at 3668 Broadway, New York, New York 10032.

12.       Defendant J.A.H. Rooms For Rent is, upon information and belief, an entity not registered with the State of New York.  Upon information and belief, J.A.H. Rooms For Rent does business at 2140 Amsterdam Avenue, New York, New York 10032.

13.       Defendant MyNewRoommate, Inc., is a domestic corporation organized under the laws of the State of New York.  Upon information and belief, MyNewRoommate, Inc., maintains an office at 104 East 40th Street, New York, New York 10016.

4

14.     Defendant New Habitat Solutions is, upon information and belief, an entity not registered with the State of New York. Upon information and belief, New Habitat Solutions does business at 602 Grand Concourse, Bronx, New York 10455.

15.     Defendant NYC Rooms for Rent, Inc., is a domestic corporation organized under the laws of the State of New York. Upon information and belief, NYC Rooms for Rent, Inc., maintains an office at 606 West 145th Street, New York, New York 10031.

16.     Defendant nygorentals.com is, upon information and belief, an entity not registered with the State of New York. Upon information and belief, nygorentals.com does business at 1454 Rockaway Parkway, Brooklyn, NY 11236.

17.     Defendant Rentasy Rentals, Inc., is a domestic corporation organized under the laws of the State of New York. Upon information and belief, Rentasy Rentals, Inc., maintains an office at 3472 Broadway, New York, New York 10031.

18.     Defendant Sool Realty Corp. is a domestic corporation organized under the laws of the State of New York. Upon information and belief, Sool Realty Corp. maintains an office at 71-24 Roosevelt Avenue, Jackson Heights, New York 11372.

## THE FAIR HOUSING ACT

19.     The Fair Housing Act, 42 USC § 3604, as amended, prohibits discrimination with respect to services relating to the ownership and rental of dwellings, including declaring it "unlawful . . . . [t]o make, print or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based on

race, color, religion, sex, handicap, familial status, or national origin, or an intention to

make any such preference, limitation or discrimination."

## THE NEW YORK CIVIL RIGHTS LAW

20.      Section 296(5)(c) of the New York Executive Law provides:

It shall be an unlawful discriminatory practice for any real estate broker, any real estate salesperson or employee or agent thereof:

(1) To refuse to sell, rent or lease any housing accommodation, land or commercial space to any person or group of persons because of the race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status of such person or persons . . . or otherwise to deny or withhold any housing accommodation . . . .

(2) To print or circulate or cause to be printed or circulated any statement, advertisement, or publication . . . which expresses, directly or indirectly, any limitation, specification, or discrimination as to race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status . . . .

## THE NEW YORK CITY CIVIL RIGHTS LAW

21.      Section 8-107(5)(c) of the New York City Administrative Code provides

as follows:

Real estate brokers. It shall be an unlawful discriminatory practice for any real estate broker, real estate salesperson or employee or agent thereof:

(1) To refuse to sell, rent or lease any housing accommodation, land or commercial space or an interest therein to any person or group of persons . . . because of the actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, marital status, partnership status, or alienage or citizenship status of such person or persons or because children are, may be or would be residing with such person or persons . . . or otherwise to deny or withhold any housing accommodation . . . .

(2) To declare, print or circulate or cause to be declared, printed or circulated any statement, advertisement, or publication . . . which expresses, directly or indirectly, any limitation, specification or discrimination as to race, creed, color, national origin, gender, age,

6

disability, sexual orientation, marital status, partnership status, or alienage
or citizenship status of such person or persons or to whether children are,
may be or would be residing with a person . . .

## THE NEW YORK REAL PROPERTY LAW

22.     Section 446-b(1) of the Real Property Law provides that "It is unlawful for

any person to act or engage in the business as an apartment information vendor in this

state without first having obtained a license from the secretary of state. No person shall

be granted a license until he has established that he is trustworthy and bears a reputation

for good and fair dealing."

23.     Section 446-a(2) of the Real Property Law defines "apartment information

vendor" ("AIV") as "any person who engages in the business of claiming, demanding,

charging, receiving, collecting, or contracting for the collection of, a fee from a customer

for furnishing information concerning the location and availability of real property,

including apartment housing, which may be leased, rented, shared or sublet as a private

dwelling, abode, or place of residence . . . ."

24.     If an unlicensed AIV "received any sum of money as compensation or

profit by or in consequence of his violation," section 446-h(3) of the Real Property law

provides a private right of action for "any person aggrieved" to recover "not more than

four times the sum so received by [the unlicensed AIV] . . . ."

## THE NEW YORK GENERAL BUSINESS LAW

25.     Section 349 of the New York General Business Law provides as follows:

(a) Deceptive acts or practices in the conduct of any business . . . are
hereby declared unlawful . . . .
***
(g) Any person who has been injured by reason of any violation of this
section may bring an action in his own name to enjoin such unlawful act

7

or practice, an action to recover his actual damages . . . or both such
actions . . . . The court may award reasonable attorney's fees to a
prevailing plaintiff.

## THE CRAIGSLIST TERMS OF USE

26.        To post an advertisement on Craigslist, an advertiser must first consent to

Craigslist's Terms of Use by clicking "I agree" (a so-called "clickwrap" agreement).

Section 1 of the Terms of Use expressly provides that "[b]y using [Craigslist] in any way,

you are agreeing to comply with the TOU."

27.        Section 7 of the Terms of Use provides:

> You agree not to post, email or otherwise make available Content;
> ***
> d) that violates the Fair Housing Act by stating, in any notice or ad for the
> sale or rental of any dwelling, a discriminatory preference . . .;
> ***
> i) that is false, deceptive, misleading, deceitful, misinformative, or
> constitutes "bait and switch";
> ***
> p) . . . that negatively affects other users' ability to use the Service;
> ***
> Additionally, you agree not to:
> ***
> v) . . . repeatedly post the same or similar Content . . .;
> ***
> y) use any form of automated device or computer program that enables the
> submission of postings on craigslist without each posting being manually
> entered by the author thereof (an "automatic posting device") . . . .

28.        Section 18 of the Terms of Use provides that "[t]he TOU and the

relationship between you and craigslist shall be governed by the laws of the State of

California without regard to its conflict of law provisions."

29.        Section 19 of the Terms of Use provides that Craigslist users may "report

any violations of the TOU . . . ."

## THE FACTS

8

A. Misconduct by Defendant American Plaza Corp.

30.     Upon information and belief, American Plaza Corp. is not licensed as an AIV by the Department of State.

31.     In response to a complaint, in or around November, 2004, the Department of State investigated American Plaza Corp., and found that a different AIV was charging customers a fee and then referring them to American Plaza Corp., where they were charged a second fee. These practices continue today. See ¶¶ 116-120.

32.     On or about May 16, 2007, White Tester 2 went to American Plaza Corp.[1] American Plaza Corp. employee Nana Romero ("Romero") gave White Tester 2 an apartment sharing contract following exactly the form required by state law. Upon information and belief, American Plaza Corp. uses this form to deceive unsuspecting room seekers into the belief that American Plaza Corp. is licensed by the Department of State.

33.     White Tester 2 returned to American Plaza Corp. to confront Romero. When asked for her AIV license, Romero attempted to show White Tester 2 a framed document, but the document was merely a New York State Department of Labor Certificate.

34.     On or about May 21, 2007, Hispanic fair housing tester Nelson Vasquez ("Vasquez") went to American Plaza Corp. Romero gave Vasquez an apartment sharing contract following exactly the form required by state law. Upon information and belief, American Plaza Corp. uses this form to deceive unsuspecting room seekers into the belief that American Plaza Corp. is licensed by the Department of State.

---

[1] White Tester 2 was sent to American Plaza Corp. by Hans Gabriel Voltaire of MyNewRoommate, Inc. See ¶117.

9

35.     On or about May 26, 2008, two fair housing testers conducted an investigation of the housing practices of American Plaza Corp.

36.     Hispanic Tester 1 entered American Plaza Corp.'s office, and told Romero that she had a room to rent in her mother's apartment for $120 per week for a single male or female, $150 for a couple, and that she wanted someone Dominican or White, but no Blacks.  Hispanic Tester 1 gave the address 550 West 157th Street (between Broadway and Amsterdam avenues) for the location of the apartment.  Romero repeated "Dominican or White" as she took the information down.  Hispanic Tester 1 left American Plaza Corp.'s office.

37.     Black Tester 1 then entered American Plaza Corp.'s office and asked for a room nearby.  Romero told him that they have rooms from $125 per week.  The $120 room that Hispanic Tester 1 listed was not mentioned.  Black Tester 1 asked Romero where the rooms were located, and Romero told him "here [160th Street] and up … and the Bronx."  Black Tester 1 asked what streets the rooms are located on, and Romero said "160, 180, 170, 190, 165, Saint Nicholas, Broadway."  Romero withheld Hispanic Tester 1's room, located on 157th Street.  Black Tester 1 left American Plaza Corp.'s office.

38.     On or about June 5, 2008, three fair housing testers conducted an investigation of the housing practices of American Plaza Corp.

39.     Hispanic Tester 1 entered American Plaza Corp.'s office and confirmed to Romero that the room she had listed was still available for rent.  Hispanic Tester 1 also told Romero that she was waiting at American Plaza Corp.'s office for her sister, who also had a room to rent.

10

40.    At or about the same time, Black Tester 2 entered American Plaza Corp.'s office. He told a second employee that Hans Gabriel Voltaire had sent him. Black Tester 2 asked for rooms around West "155 to 159" Streets. Romero saw Black Tester 2 and asked "oh, you're the guy that Gabriel sent?"

41.    Romero pointed to Black Tester 2 and asked Hispanic Tester 1 "Mommy ... you like this guy ... this guy here ... this guy here you can take him?" Hispanic Tester 1 told Romero to refer to the notes, by which she meant the notes of her prior visit, when she requested no Black applicants. Romero did not inform Black Tester 2 of the Hispanic Tester 1 listing, even though it is in the geographic area Black Tester 2 requested.

42.    Black Tester 1 then entered American Plaza Corp.'s office and told Romero that he is looking for a room "159 and down." Romero told Black Tester 1 that they had nothing that day, but maybe the next day. Romero withheld Hispanic Tester 1's room from Black Tester 1. Black Tester 1 then left the American Plaza Corp. office.

43.    The second employee told Black Tester 2 about a rental on West 163rd Street. Black Tester 2 left American Plaza Corp.'s office, claiming that he was going to get cash for American Plaza Corp.'s fees.

44.    Hispanic Tester 1 asked if Romero knows who she is looking for, and Romero shook her head yes. Romero asked if Hispanic Tester 1 will "take a White American?" Hispanic Tester 1 confirmed that she would, and Romero confirmed that she wrote down White American. Hispanic Tester 1 then left the American Plaza Corp. office.

11

45.     Black Tester 2 returned to American Plaza Corp.'s office and asked Romero for the exact location of the room he was referred to. Romero told him that the room was at 163rd Street and Broadway. Black Tester 2 asked if American Plaza Corp. had any room south of 160th Street. Romero admitted they did, but claimed that the landlords did not speak English. Hispanic Tester 1's listing was withheld.

46.     Black Tester 1 returned to American Plaza Corp.'s office and told Romero that he was looking for a room "159 and down." Romero told Black Tester 1 that they had nothing that day, but maybe the next day. Hispanic Tester 1's listing was withheld.

B. Misconduct by Defendant City Rooms, Inc.

47.     Upon information and belief, City Rooms, Inc., is run by Harry Jeanty ("Jeanty") and Jeff Gravesande ("Gravesande"). Jeanty was licensed by the Department of State as an apartment information vendor ("AIV") until October 31, 2001, when his license expired. Due to customer complaints against him, the Department of State placed a hold against any attempted renewal by Jeanty. In order to run City Rooms, Inc., Gravesande obtained an AIV license from the Department of State, which expired on October 31, 2006.

48.     On February 13, 2004, the Department of State brought a complaint against City Rooms, Inc., for violating Article 12-C of the New York Real Property Law, alleging that "Gravesende . . . engaged in fraudulent practices, dishonest or misleading advertising, and/or demonstrated untrustworthiness or incompetency as an apartment information vendor . . . ."

12

49.        On July 9, 2004 City Rooms, Inc., signed a consent order admitting to violating Article 12-C of the New York Real Property Law.  Upon information and belief, on January 31, 2006 the Department of State put a hold on Gravesende's license renewal due to customer complaints, making City Rooms, Inc., an unlicensed AIV.

50.        On or about January 31, 2006, the DOS put a hold on the City Rooms license for failure to cooperate in the investigation of a complaint.

51.        Since February 1, 2006, City Rooms has operated as an unlicensed apartment sharing agent.

52.        On or about March 7, 2008, witness Wilson Astudillo ("Astudillo") went to City Rooms, Inc., and paid Jeanty a fee of $175 for apartment  sharing services. Astudillo learned about City Rooms, Inc., on Craigslist.  Instead of referring him to any apartments, Jeanty sent Astudillo to a second unlicensed AIV, Tony's Rooms.

53.        On or about May 23, 2008, witness Kate Lontatidze ("Lontatidz") went to City Rooms, Inc., and paid Jeanty a fee of $200 for apartment sharing services. Lontatidze learned about City Rooms, Inc., on Craigslist.   Jeanty had Lontatidz complete a standard apartment sharing contract, which had an official statement and the Department of State's contact information on the bottom of the page.  This form misled Lontatidz into believing that City Rooms, Inc., was licensed by the Department of State. Even after she called on three separate days, City Rooms, Inc., did not refer Lontatidz to any apartments.

54.        On or about July 29, 2008, witness Alexis Yavne ("Yavne") went to City Rooms, Inc., and paid Jeanty a fee of $175 for apartment sharing services.  Yavne learned about City Rooms, Inc., on Craigslist.   Jeanty told Yavne that the fee would be credited

towards her security deposit when she rented a room, but Yavne later discovered that the $175 was a registration fee that would not be applied to her security deposit.

55.       On or about August 29, 2008, witness Michael Moore ("Moore") went to City Rooms, Inc., and paid Jeanty a fee of $175 for apartment sharing services.  Moore learned about City Rooms, Inc., on Craigslist.  Jeanty referred Moore to two rooms.  The first was unacceptable.  The second was potentially acceptable, but Jeanty demanded Moore pay an additional fee of $1800 before moving in.

56.       Between December 2007 and July 2008, City Rooms, Inc., posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist.  Such phrases included: "no kids," "double or single occupance," "single or double," "for a special person who is nice and easy going," "couples welcome," "for couples," "perfect for single or couple," "great room for couples," "couples ok," and "you guys are a couple now."  All of these terms facially discriminate on the basis of familial status: other than the first (which says so outright), all clearly imply "no children."

57.       On or about August 12, 2008, City Rooms, Inc., posted housing advertisements containing facially discriminatory words or phrases on Craigslist.  Such phrases included "for **working person**."  The phrase "working person" is facially discriminatory and violates the familial status and the disability provision of the Fair Housing Act.

58.       Upon information and belief, City Rooms, Inc., posted the same listing multiple times on Craigslist ("spamming").  For example, on June 1, 2008, a search of Craigslists' New York City housing list revealed approximately 1450 City Rooms, Inc.,

14

listings. A search on May 20, 2008, revealed approximately 2800 City Rooms, Inc.,

listings. Another search, on August 15, 2008, revealed 280 links.

59.     Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The

high volume of links gives customers the impression that City Rooms Inc is a leader in

the industry and a reliable, legitimate business. The high volume of links also squeezes

out City Rooms Inc's reputable, licensed competitors, such as plaintiffs ABC Real Estate

Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical

listings they post.

C. Misconduct by Defendant Coronado Sigue Multi-Service, Inc.

60.     On information and belief, Coronado Sigue Multi-Service, Inc.,

("Coronado") is not licensed as an AIV by the Department of State.

61.     On or about June 11, 2008, witness Anita Mason ("Mason") went to

Coronado, and paid a fee of $100 for apartment sharing services. Mason learned about

Coronado on Craigslist. As of June 20, 2008, Mason had not rented a room through

Coronado.

62.     In or about May 2008, Coronado posted numerous housing advertisements

containing facially discriminatory words or phrases on Craigslist. Such phrases included:

"If you are a single individual or if you are married and seeking a room to share, we will

accommodate you," "if you are single or are a couple and need a room, come to us,"

"Price: $125 and up for singles $150 for couples." The words "single," "couple," and

"married" are all facially discriminatory and violate the familial status provision of the

Fair Housing Act. The word "married" also violates the religion provision of the Fair

Housing Act.

15

63.      On or about May 26, 2008, three fair housing testers conducted an investigation of the housing practices of Coronado.

64.      Hispanic Tester 1 entered Coronado's office, and told the Hispanic employee at the desk that she had a room to rent for $115 per week for a single male or female, $150 for a couple, and that she wanted someone Dominican or White, but no Blacks. Hispanic Tester 1 gave the address 507 West 179th Street (just around the corner from Defendant's office) for the location of the apartment. The employee repeated "Dominican or White people" and "no Blacks" as she took the information down. Hispanic Tester 1 left Coronado's office.

65.      Black Tester 1 then entered Coronado's office and asked for a room nearby. A second employee told him that they have rooms from $125 per week. The $115 room that Hispanic Tester 1 listed was not mentioned. After purporting to get money from an ATM, Black Tester 1 returned to Coronado's office and again asked the second employee about a room in the immediate area. The second employee referred Black Tester 1 to a Hispanic man sitting at the next desk who answered to the name "Coronado." Coronado told Black Tester 1 that the closest rooms were at West 205th Street and West 207th Street. Coronado withheld the Hispanic Tester 1 listing.

66.      After Black Tester 1 left, White Tester 1 and Hispanic Tester 2 entered Coronado's office. . Speaking on behalf of Hispanic Tester 2, White Tester 1 asked for a room "right around 178th Street or 179th Street for 125 weekly or less." The second employee offered Hispanic Tester 2 the room on West 179th Street that Hispanic Tester 1 had listed with Coronado minutes earlier.

16

67.     Upon information and belief, Coronado engages in spamming on Craigslist. For example, on May 19, 2008, a search of Craigslists' New York City housing list revealed approximately 50 Coronado listings. Another search, on August 15, 2008, revealed 100 listings.

68.     Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that Coronado is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out Coronado's reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc., and Santos Realty Inc., by overwhelming the legitimate and non-identical listings they post.

69.     As well as spamming, Coronado engages in other deceptive practices. On information and belief, in May 2008, Coronado used pictures of luxurious hotel rooms on numerous Craigslist posts in order to ensnare would-be room seekers and deceive them as to the unlicensed nature of Coronado's business.

D. Misconduct by Defendant ERR NYC LLC

70.     Upon information and belief, ERR NYC LLC is not licensed as an AIV by the Department of State.

71.     On or about May 10, 2008 witness Oliver Wallace ("Wallace") went to ERR NYC LLC and paid an individual named "Jason" a fee of $200 for their apartment sharing services. Wallace found ERR NYC LLC on Craigslist. Wallace was sent to two apartments he considered unacceptable. Wallace then asked Jason for his money back, but Jason refused. When Wallace asked Jason if ERR NYC LLC was licensed, Jason claimed it was.

17

72.     On August 14, 2007, two fair housing testers conducted an investigation of the housing practices of ERR NYC LLC.  White Tester 1 entered the ERR NYC LLC office and told the employee sitting at the desk that he had a room to rent, available immediately, and the rent was $100 per week for a single person. During the colloquy, the ERR NYC LLC Hispanic male employee asked White Tester 1 "What type of people you looking for?" and was told "Spanish people, Dominicans, and no Puerto Ricans"  As the ERR NYC LLC employee is writing the information to the listing card, he stated out loud "no African Americans..." White Tester 1 told the ERR NYC LLC employee that the house was two blocks away, and that the address where the rooms were located was 371 East 153rd Street, Bronx, NY 10455. White Tester 1 told the ERR NYC LLC employee that he was not the owner, and the ERR NYC LLC stated "primary tenant?" which White Tester 1 confirmed as true.  As White Tester 1 was exiting the ERR NYC LLC's office, he stated to the ERR NYC LLC employee "and by the way, no White guys either." drawing the response "all right, no problem."

73.     Immediately thereafter, Black Tester 3 arrived at the ERR NYC LLC office and asked for rooms in the immediate area of zip code 10455, where the ERR NYC LLC office is located. The ERR NYC LLC employee withheld the rooms just listed by White Tester 1, and instead steered Black Tester 3 to the Yankee Stadium area, several miles to the North and West.  Black Tester 3 paid the ERR NYC LLC registration fee of one hundred fifty dollars, received no referrals to any rooms in that area, and was told to contact the ERR NYC LLC employee later that evening to see if there were any rooms for him. Black Tester 3 exited the ERR NYC LLC office.

74.      White Tester 1 returned to the ERR NYC LLC's office and told the employee that he listed the rooms with that he saw a Black guy leaving the office as he was entering. During the colloquy, the ERR NYC LLC Hispanic male employee confirmed that the Black guy was looking in that immediate area, however he assured White Tester 1 that ERR NYC LLC was not going to send him as per the listing requirements.

75.      On March 24, 2008, based on the complaint filed by White Tester 1, the New York State Division of Human Rights determined that there was probable cause to believe that ERR NYC LLC (then "Express Room Rentals") engaged in unlawful discrimination in housing based upon race or color.

76.      In or about May 2008, ERR NYC LLC posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist.  Such phrases included: "Students and working people welcomed," "couple and single people are welcome," "Students/Couples are welcomed," "couple and single person are welcome." The words "single" and "couple" are facially discriminatory and violate the familial status provision of the Fair Housing Act.  The phrase "working people" also violates the disability provision of the Fair Housing Act.

77.      On or about June 5, 2008, three fair housing testers conducted an investigation of the housing practices of ERR NYC LLC.

78.      Hispanic Tester 1 entered ERR NYC LLC's office and told the employee at the  desk that she had a room to rent, available immediately, for $115 per week for a single person, $150 for a couple. When asked "What type of person you looking for?" Hispanic Tester 1 responded "Dominican."    Hispanic Tester 1 gave the address 3495

19

Broadway, between 142nd and 143rd Streets, for the location of the apartment.   Hispanic

Tester 1 then left ERR NYC LLC's office.

79.       Black Tester 2 entered ERR NYC LLC's office and asked for a room

available immediately "anywhere around Broadway, anywhere around here." ERR NYC

LLC's office is located on Broadway, between West 141st and West 142nd Streets. An

employee told him that they had a room on Audubon between West 169th and 170th

streets.   Black Tester 2 was also told about a second room, on West 143rd street, which

would not be available for another five days.   The room Hispanic Tester 1 listed was

withheld.   Black Tester 2 was finally told to try Rentasy.  Upon information and belief,

Rentasy Rentals, Inc., is a direct competitor of ERR NYC LLC, located across the street

from ERR NYC LLC.

80.       After Black Tester 2 left, Black Tester 1 entered ERR NYC LLC's office

and asked for a room "around here."  An employee told Black Tester 1 "Right now, sir,

we only have rooms in the Bronx."  The room Hispanic Tester 1 listed was withheld from

Black Tester 1, and he, too, was told to try Rentasy.

81.       Upon information and belief, ERR NYC LLC engages in spamming on

Craigslist.  For example, on May 19, 2008, a search of Craigslists' New York City

housing list revealed approximately 500 ERR NYC LLC listings, and on June 1, 2008 a

Craigslist search revealed approximately 250 ERR NYC LLC listings.

82.       Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27).  The

high volume of links gives customers the impression that ERR NYC LLC is a leader in

the industry and a reliable, legitimate business.  The high volume of links also squeezes

out ERR NYC LLC's reputable, licensed competitors, such as plaintiffs ABC Real Estate

Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical listings they post.

83.    As well as spamming, ERR NYC LLC engages in other deceptive practices. In May and June 2008, ERR NYC LLC's Craigslist postings included claims that ERR NYC LLC had "hundreds of rooms available today," "no security deposit to rent rooms," and "We are the largest roommate provider in the city." Upon information and belief, each one of these claims is an outright falsehood, intended to deceive unsuspecting room seekers into the hands of ERR NYC LLC's unlawful business.

E. Misconduct by Defendant Easy Room Rentals

84.    On information and belief, Easy Room Rentals is not licensed as an AIV by the Department of State.

85.    On or about August 30, 2008, two fair housing testers conducted an investigation of the housing practices of Easy Room Rentals.

86.    Hispanic Tester 1 entered Easy Room Rentals' office and told the owner, Irene Zaldumbide ("Zaldumbide") that she wanted to rent a room in the area. Zaldumbide asked if Hispanic Tester 1 could pay monthly, and when Hispanic Tester 1 said she could, Zaldumbide told her about a room on Northern Boulevard, by 68th Street, in Woodside, for $500 a month. Hispanic Tester 1 asked what the people's ethnicity was, and Zaldumbide told her Spanish or Mexican. Hispanic Tester 1 declared that she did not want to live with Blacks. Zaldumbide assured her that she would inform her of the ethnicity of the people in the apartment before sending her there. Hispanic Tester 1 left Easy Room Rentals' office, purportedly to get cash.

87.     Hispanic Tester 1 returned to Easy Room Rental's office and told Zaldumbide that she needed a few more options, and asked if she had any rooms for $125 weekly. Zaldumbide mentions three rooms: on 68th Street, by 31st Avenue, in Black Tester 1 Heights, for $125 weekly; on 79th Street, by 40th Avenue, in Black Tester 1 Heights, for $500 monthly; on 80th Street, by Astoria Boulevard, in Astoria, for $125 weekly. Zaldumbide tells Hispanic Tester 1 that the room on 68th Street is the most convenient. Hispanic Tester 1 asks if the people there are Spanish, and Zaldumbide confirms that they are. Hispanic Tester 1 then left Easy Room Rental's office.

88.     Black Tester 6 then entered Easy Room Rental's office and asked for a room in Jackson Heights, adding that she would take a room in Jamaica if she had to. Zaldumbide asked if Black Tester 6 could pay monthly, and when Black Tester 6 said she could, Zaldumbide told her about a room on 138th Street, by 88th Avenue, in Jamaica, for $150 a week. Black Tester 6 told Zaldumbide that she worked at a school in Jackson Heights, on 77th Street by Roosevelt Avenue. Zaldumbide then offered a room on 90th Street, by Roosevelt Avenue, in Elmhurst, for $160 a week but Black Tester 6 said she wants a room in the immediate area of her work. Zaldumbide offered Black Tester 6 a room on 80th Street, by 41st Avenue, in Elmhurst, for $500 a month plus utilities. Black Tester 6 asked if there were any other options, and Zaldumbide said no, nothing else weekly. Zaldumbide withheld all three of the rooms offered to Hispanic Tester 1.

89.     Upon information and belief, Easy Room Rentals engages in spamming on Craigslist. For example, on August 17, 2008, a search of Craigslists' New York City housing list revealed approximately 5 Easy Room Rentals listings.

90.     Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that Easy Room Rentals is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out Easy Room Rentals's reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical listings they post.

F.   Misconduct by Defendant Flash Rentals aka Dominic Rentals

91.     On information and belief, Flash Rentals is not licensed as an AIV by the Department of State.

92.     In or about June 2008, witness Walter Collado ("Collado") went to Flash Rentals and paid an individual named "Lorenzo" a fee of $150 for apartment sharing services. Collado learned about Flash Rentals on Craigslist, through postings claiming that Flash rentals had rooms requiring no deposit to move in.

93.     In or about May 2008, Flash Rentals posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included: "couples and single person," "$90-125 for single ladies," "$100-125 for single gentle men," "$150-$175 for couples," "rooms start at $125 a week for a single person and for a couple $150 a week." The words "single," "couple," and "couples" are all facially discriminatory and violate the familial status provision of the Fair Housing Act.

94.     On or about May 29, 2008, two fair housing testers conducted an investigation of the housing practices of Flash Rentals.

95.     White Tester 1 entered Flash Rentals's location -- inside a cell phone store -- and told an individual at the Flash Rentals desk that he had a room to rent for $125 per week for a single person, $150 for a couple, that he wanted someone Dominican or White, but no Blacks. The person White Tester 1 spoke to, "Lorenzo," is on information and belief the owner of Flash Rentals, and is not a licensed AIV. Lorenzo misinformed White Tester 1 by declaring himself to be a licensed real estate broker. White Tester 1 also told Lorenzo that he doesn't want any tenants with children, and Lorenzo agrees.  White Tester 1 gave Lorenzo the address 551 West 157th Street, as the location of the apartment.  White Tester 1 left Flash Rentals's office.

96.     Black Tester 3 then entered Flash Rentals's location. He told Lorenzo that he wanted a room between West 155th and 160th Streets, priced between $125 and $150 per week. Lorenzo told Black Tester 3 to come back the next day, and did not inform him of the White Tester 1 listing. While  Black Tester 3 was waiting at the Flash Rentals  office, a Black female who was also present told  Black Tester 3 that she found out about Flash Rentals on Craigslist, and that she was having trouble getting a room because she has children.

97.     After Black Tester 3 left Flash Rentals's location, White Tester 1 returned. White Tester 1 spoke with Lorenzo and confirmed that he would not send the Black male who just left (Black Tester 3), and that Lorenzo would not send the Black female who was also present.    White Tester 1 then shook Lorenzo's hand and left.

98.     Upon information and belief, Flash Rentals engages in spamming on Craigslist. For example, on May 19, 2008, a search of Craigslists' New York City housing list revealed approximately 50 Flash Rentals listings, and on June 1, 2008 a

24

Craigslist search revealed approximately 95 Flash Rentals listings. Another search, on August 15, 2008, revealed 100 listings.

99.     Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that Flash Rentals is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out Flash Rentals's reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical listings they post.

100.    As well as spamming, Flash Rentals engages in other deceptive practices. In May and June 2008, Flash Rentals's Craigslist postings included claims that Flash Rentals is "Licensed By The New York State Department," "Licensed By NY Dept. of State," and "Licensed and certified by the State of New York." Additionally, Flash Rentals claims "We are not asking for deposit to rent the room. We charge you only with $100 dollars to you move in," and "no deposit and only with $100 dollars fee to move in." Upon information and belief, each one of these claims is an outright falsehood, intended to deceive unsuspecting room seekers into the hands of Flash Rentals's unlawful business.

G. Misconduct by Defendant J.A.H. Rooms for Rent

101.    On information and belief, J.A.H. Rooms For Rent is not licensed as an AIV by the Department of State.

102.    In or about May 2008, J.A.H. Rooms For Rent posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included: "Students/Couples are welcomed," "couples and single person," "$100-

125 for single ladies," "$100-125 for single gentle men," "$150-$175 for couples," "from

$125 per week for a single person and $150 for couples," "$125 and up for singles $150

for couples," "Singles or couples accepted." The words "single," "singles," and

"couples" are all facially discriminatory and violate the familial status provision of the

Fair Housing Act.

103.     On or about May 26, 2008, four fair housing testers conducted an

investigation of the housing practices of J.A.H. Rooms For Rent.

104.     Hispanic Tester 1 entered J.A.H. Rooms For Rent's office, and told the

person there that she had a room to rent for $115 per week for a single person, $150 for a

couple, that she wanted someone Dominican or White, but no Blacks, and no children.

Hispanic Tester 1 gave the address 165 Hillside Avenue (right next to the Dyckman

Street subway stop) for the location of the apartment.   On information and belief, the

person Hispanic Tester 1 spoke to was Jessica Cruz ("Cruz"), owner of J.A.H. Rooms For

Rent.

105.     Black Tester 1 then entered J.A.H. Rooms For Rent's office and asked for

a room near the Dyckman Street subway station, price between $115 and $125 a week.

Cruz told Black Tester 1 about three rooms, two each about half a mile from the

Dyckman Street subway station, and one on 139th Street, seven subway stops away from

the Dyckman Street subway station. Cruz withheld the room listed by Hispanic Tester 1,

which was closer and within the price range of Black Tester 1. After purporting to get

money from an ATM, Black Tester 1 returned to the office and again asked Cruz if there

were any rooms in the immediate area of the Dyckman Street Subway Stop. Cruz told

him "Not for you, not for guys at this moment, I got to be honest with you." Cruz again

withheld the room listed by Hispanic Tester 1, which was closer and in his price range.

106.     After Black Tester 1 left, immediately thereafter, White Tester 1 and

Hispanic Tester 2 entered the J.A.H. Rooms For Rent's office.   White Tester 1 told Cruz

that Hispanic Tester 2 needed a room near the Dyckman Street subway station.  Cruz

offered to show Hispanic Tester 2 the room listed by Hispanic Tester 1.

107.     On or about May 28, 2008, four fair housing testers conduct a second

investigation of the housing practices of J.A.H. Rooms For Rent.

108.     Hispanic Testers 1 and 3 entered the J.A.H. Rooms For Rent office and

told Cruz that the family of Hispanic Tester 3 also had two rooms to rent in the same

building where Hispanic Tester 1 listed her rooms on May 26th.   Hispanic Tester 3 told

Cruz "my mom only wants Dominican people, she doesn't want nobody else."  Cruz

responded "that's ok. . ."  While Hispanic Testers 1 and 3 were speaking to Cruz, Black

Tester 4 entered the J.A.H. Rooms For Rent office, approached Cruz's desk, and told her

that he was looking for a room in the immediate area and would return the next day.  As

soon as Black Tester 4 left, Hispanic Tester 1 told Cruz "people like that, don't bring

them in."  Cruz replied "don't worry, don't worry, I got to have rooms for all kinds of

people. . ."  Hispanic Testers 1 and 3 left the J.A.H. Rooms For Rent office.

109.     Black Tester 3 then entered J.A.H. Rooms For Rent. Cruz told him "oh,

the lady she already left ..." and that "she's gonna be back tomorrow. . ."  Black Tester 3

left, but returned later that day and was again denied service by Cruz, who told him "the

lady is the one who knows, the other lady and she left already . . ." The "lady" who could

rent  Black Tester 3 a room was, of course, none other than Cruz herself.

27

110.    On or about June 7, 2008, two fair housing testers conducted an investigation of the housing practices of J.A.H. Rooms For Rent.

111.    White Tester 2 entered J.A.H. Rooms For Rent and told Cruz that he wanted a room in Manhattan. Cruz provided him with the addresses of four rooms in Manhattan: 204th and Vermilyea, 207th and Sherman Avenue, West 184th between Wadsworth and Saint Nicholas, and West 161st and Fort Washington Avenue. White Tester 2 then left the J.A.H. Rooms For Rent office.

112.    Black Tester 5 then entered J.A.H. Rooms For Rent, and told Cruz that he wanted a room in the Bronx or Manhattan. Cruz told him about four rooms in the Bronx: West 156th and Grand Concourse, Belmont Avenue and East 180th Street, a room in Kingsbridge, and one in Parkchester. Cruz did not tell Black Tester 5 about any rooms in Manhattan.

113.    Upon information and belief, J.A.H. Rooms For Rent engages in spamming on Craigslist. For example, on May 19, 2008, a search of Craigslists' New York City housing list revealed approximately 275 J.A.H. Rooms For Rent listings, and on June 1, 2008, a Craigslist search revealed approximately 180 J.A.H. Rooms For Rent listings.

114.    Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that J.A.H. Rooms For Rent is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out J.A.H. Rooms For Rent's reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc. and Santos Realty Inc. by overwhelming the legitimate and non-identical listings they post.

H. Misconduct by Defendants MyNewRoomate, Inc. and Hans Gabriel Voltaire A/K/A
   Louis Solis

115.    Upon information and belief, MyNewRoommate, Inc. is owned by Hans

Gabriel Voltaire ("Voltaire").  Voltaire was formerly licensed by the Department of State

as an AIV in connection with a prior business, US Rooms For Rent, but that license

expired on October 31, 2004.  MyNewRoommate, Inc. is not licensed as an AIV by the

Department of State.

116.    Upon information and belief, MyNewRoommate, Inc. and Voltaire collect

fees from unsuspecting room seekers, only to then refer them to a second unlicensed

AIV, American Plaza Corp., where they are required to pay a second fee.  Voltaire

characterizes American Plaza Corp. as his "room agent," making MyNewRoommate, Inc.

and Voltaire liable for American Plaza Corp.'s unlawful actions.

117.    On or about May 16, 2007, White Tester 2 went to MyNewRoomate, Inc.,

and paid Voltaire a fee of $260 for apartment sharing services.    Instead of referring

White Tester 2 to any apartments, Voltaire referred him to American Plaza Corp., another

unlicensed AIV, which Voltaire characterized as his "room agent."  American Plaza

Corp. demanded another fee from White Tester 2.

118.    On or about October 4, 2007, Black Tester 6 went to MyNewRoomate,

Inc., and paid Voltaire a fee of $260 for apartment sharing services.    Instead of referring

Black Tester 6 to any apartments, Voltaire referred her to American Plaza Corp.

119.    Black Tester 6 and Black Tester 3 returned to MyNewRoomate, Inc., to

confront Voltaire and demand a refund.  When Black Tester 3 told Voltaire that he was

required to have a license by the Real Property Law, Voltaire responded "Get the fuck

out of my office!" When asked for a refund, Voltaire responded "Fuck you, fuck you, fuck you, fuck you!"

120.     On or about June 3, 2008, Black Tester 2 went to MyNewRoomate, Inc., and paid Voltaire a fee of $150 for apartment sharing services. Black Tester 2 learned about MyNewRoomate, Inc., on Craigslist. Instead of referring Black Tester 2 to any apartments, Voltaire referred him to American Plaza Corp., another unlicensed AIV, which Voltaire characterized as his "room agent." Voltaire claimed that American Plaza Corp. was a room manager, but when Black Tester 2 responded to the American Plaza Corp. office, they demanded a second fee from him. American Plaza Corp. engaged in unlawful discrimination with regard to Black Tester 2.

121.     In or about May and July 2008, MyNewRoommate, Inc., posted housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included "double or single occupance," "rooms for couples," and "with nice Dominican family." The phrases "single" and "couples" are facially discriminatory and violates the familial status provision of the Fair Housing Act. The phrase "nice Dominican family" is facially discriminatory and violates the race and national origin provisions of the Fair Housing Act by suggesting that only Dominicans need apply.

122.     On or about September 6, 2008, MyNewRoommate, Inc., posted housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included "just ideal for students." That phrase is facially discriminatory and violates the familial status provision of the Fair Housing Act.

123.     Upon information and belief, MyNewRoommate, Inc., engages in spamming on Craigslist. For example, on May 20, 2008, a search of Craigslists' New

30

York City housing list revealed approximately 1200 MyNewRoommate, Inc., listings, and on June 1, 2008, a Craigslist search revealed approximately 600 MyNewRoommate, Inc., listings. Another search, on August 15, 2008, revealed 120 listings.

124.    Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that MyNewRoommate, Inc., is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out MyNewRoommate, Inc.'s reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc. and Santos Realty Inc. by overwhelming the legitimate and non-identical listings they post.

125.    Upon information and belief, Voltaire also does business under the alias "Luis Solis."

126.    Upon information and belief, Luis Solis engages in spamming on Craigslist. For example, on August 17, 2008, a search of Craigslists' New York City housing list revealed approximately 140 listings by Luis Solis.

127.    As well as spamming, Luis Solis engages in other deceptive practices. On or about August 17, 2008, New Habitat Solutions' Craigslist postings included numerous postings that containing phrases such as "about me," "my old roommate," "we," and "I." Upon information and belief, these phrases are intended to deceive unsuspecting room seekers into believing that the advertised rooms are being rented by the occupants and not by an unlicensed AIV.

I. Misconduct by Defendant New Habitat Solutions

128.    Upon information and belief, New Habitat Solutions is not licensed as an AIV by the Department of State.

31

129.     On or about August 1, 2008, New Habitat Solutions posted housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included "Singles, single…" and "Couples, couples…" The words "single," "singles," and "couples" are facially discriminatory and violate the familial status provision of the Fair Housing Act.

130.     On or about August 26, 2008, witness John Kirtz ("Kirtz") went to New Habitat Solutions and paid an individual named "Justin" a fee of $150 for apartment sharing services. Kirtz found out about New Habitat Solutions on Craigslist. Justin sent Kirtz to a room where he was told that any rental would have to be kept secret because the landlord was unaware that the room was being sublet.

131.     On August 16, 2008, two fair housing testers conducted an investigation of the housing practices of New Habitat Solutions.

132.     White Tester 1 entered New Habitat Solutions and told the employee, who identified himself as "Jay" or "Justin,"[2] that he had two rooms for rent located at 318 East 153rd Street in the Bronx. The rooms were $115.00 and $125.00 weekly. White Tester 1 instructed Justin that he needed only working people, and not to send anyone collecting disability benefits, and that he didn't want anyone with a child, drawing the following responses, "we'll send you what you're looking for" and "ok good, just a single person."

133.     White Tester 1 then declared that he wanted someone White or Spanish, and not to send any Blacks. Justin told White Tester 1 that he could not do that because it would be discrimination. White Tester 1 took the index card the apartment details were written on and left the office, but then returned after a few moments. White Tester 1

---

[2] "Justin" was working at ERR NYC LLC when testing was conducted there on June 5, 2008. At that time, he was identified as "employee 1." See supra, ¶ 78.

handed Justin the card and told him he could have the listings, but to send the right people. Justin replied "all right, I'll send you the right people, no problem." White Tester 1 then exited the New Habitat Solutions office.

134.    Black Tester 1 entered the New Habitat Solutions office and told Justin he needed a room in the immediate area, near the 149th Street/Grand Concourse train station, at the best price possible. Justin told Black Tester 1 about a room on East 143rd Street and Morris Avenue for $125.00 and a room near Yankee Stadium (164th Street and Grand Concourse) for $125.00 to $150.00. Justin withheld the rooms listed by White Tester 1 on 153rd street, sandwiched between the listings he did provide, and told Black Tester 1 that those were the only rooms he had in the area.

135.    Black Tester 1 asked Justin if New Habitat Solutions was licensed by the Department of State. In an apparent attempt to deceive Black Tester 1 about the fact that New Habitat Solutions was not licensed as an AIV, Justin replied that the owner was a broker. Black Tester 1 then left New Habitat Solutions' office.

136.    Upon information and belief, New Habitat Solutions engages in spamming on Craigslist. For example, on August 3, 2008, a search of Craigslists' New York City housing list revealed approximately 75 New Habitat Solutions listings. Another search, on August 15, 2008, revealed 90 listings.

137.    Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that New Habitat Solutions is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out New Habitat Solutions' reputable, licensed competitors, such as plaintiffs

ABC Real Estate Services, Inc., and Santos Realty Inc., by overwhelming the legitimate and non-identical listings they post.

138.     As well as spamming, New Habitat Solutions engages in other deceptive practices.   On or about August 1, 2008, New Habitat Solutions' Craigslist postings included claims that they were the "the largest roommate service provider in the city" and "we are the largest roommate service."  Upon information and belief, this claim is an outright falsehood, intended to deceive unsuspecting room seekers into the hands of New Habitat Solutions' unlawful business.

J.  Misconduct by Defendant NYC Rooms for Rent, Inc.

139.     Upon information and belief, the Department of State charged NYC Rooms for Rent, Inc., with a variety of violations of Article 12-C of the Real Property Law, including "causing Mr. Henry [the complainant] to be rejected on the basis of race" and "failing to return Mr. Henry's $100 rental deposit."  On March 7, 2004, NYC Rooms for Rent, Inc., through its representative Velquis Estevez, signed a consent order admitting to certain violations of Article 12-C.

140.     In or about November 2007 through May 2008, NYC Rooms for Rent, Inc., posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist.  Such phrases included: "Clients, Students, Couples, Singles, Working Individuals, Vacationers," "working individuals welcomed," "$100-$125 for single $150 for couple," "$100 to $125 per week for a single person or $150 for a couple," "Singles or Couples accepted," "$100 to $150 per week for couples and single person."  The words "single," "singles," "couple," and "couples" are all facially discriminatory and violate the familial status provision of the Fair Housing Act.  The

phrase "working individuals" is also facially discriminatory and violates the disability provision of the Fair Housing Act.

141.     On November 24, 2007, two fair housing testers conducted an investigation of the housing practices of NYC Rooms For Rent, Inc.

142.     White Tester 1 entered NYC Rooms For Rent, Inc., and told the employee, who identified himself as "Jose", that he had two rooms for rent in his apartment at 610 West 145th Street, between Broadway and Riverside Drive, in Manhattan (two buildings to the West of the NYC Rooms For Rent office). The price of each room was $115.00 and $125.00 weekly. White Tester 1 instructed Jose to send someone Spanish, drawing the following responses, "we'll check, we'll check someone that's right for you, don't worry about it." and "We're definitely gonna call you up and explain what the person does and who it is, all right?" Immediately thereafter, White Tester 1 exited the NYC Rooms For Rent office.

143.     Black Tester 1 entered the NYC Rooms For Rent and was interviewed by Jose. Black Tester 1 told Jose that he needs a room by Riverbank Park (The main entrance to the park is located at the end of West 145th Street, one block to the West of the NYC Rooms For Rent Inc., office. The two rooms White Tester 1 listed are located in a building 100 feet to the West of the NYC Rooms For Rent office at 610 West 145th Street). Thereafter, Black Tester 1 told Jose that his limit on rent was $125.00 weekly. Jose withheld the rooms listed by White Tester 1 for $100.00 weekly, and instead referred Black Tester 1 to a room on Riverside Drive for $150.00 weekly.

144.     After Black Tester 1 exited, White Tester 1 returned to the NYC Rooms For Rent Inc. office, and the following colloquy emerged. White Tester 1 asked Jose if

he [Black Tester 1] was looking around that area. Jose's response, "Yea." White Tester 1 stated to Jose, "Don't... you know [send blacks]..." Jose's response: "We call you first, don't worry about it." White Tester 1 then asked Jose if he wanted to go see the room with him? Jose's response: "We're not allowed to."

145.      On November 30, 2008, four fair housing testers conducted an investigation of the housing practices of NYC Rooms For Rent, Inc.

146.      Hispanic Tester 1 arrived at the NYC Rooms For Rent, Inc., office and spoke to Jose about two rooms for $100.00 weekly that she listed with their office one hour earlier that day. The location of the rooms was at 676 Riverside Drive, in Manhattan, by the corner of West 145th Street. Jose asked Jamie "what kind of people are you looking for?" Hispanic Tester 1 told Jose that she didn't want anyone who was "Black", and Jose replied, "no problem." Hispanic Tester 1 then told Jose that she wanted someone "Dominican", and Jose then shook his head yes in agreement. Hispanic Tester 1 then exited the NYC Rooms For Rent, Inc., office.

147.      Immediately thereafter, Black Tester 3 responded to the NYC Rooms For Rent, Inc., office and was assisted by Jose. Black Tester 3 told Jose that he needed a room for $100.00 weekly in that immediate area. Jose told Black Tester 3 that there were only two options in Manhattan, one for $175.00 weekly on West 142nd Street, and another one for $150.00 weekly if Black Tester 3 could spend that much. Black Tester 3 told Jose that he can spend up to $105.00 weekly. Jose stated to Black Tester 3, "nothing at all for that range at all." Jose withheld the rooms priced at $100.00 weekly listed earlier by Hispanic Tester 1, on Riverside Drive (one block away). Black Tester 3 exited the NYC Rooms For Rent Inc., office.

148.    Immediately thereafter, Black Tester 4 responded to the NYC Rooms For Rent Inc., office and was assisted by Jose. Black Tester 4 told Jose that he needed a room for in that immediate area. Jose told Black Tester 4 that there was only option in Manhattan, one for $125.00 weekly on West 142nd Street. Black Tester 4 asked Jose, "Is that the only room you have?", and Jose stated to him, "for today... in Manhattan... $125.00 per week." Black Tester 4 asked Jose, "Do you have anything for a little bit less?", and Jose replied, "Not in Manhattan, that's the minimum in Manhattan." Jose withheld the rooms priced at $100.00 weekly listed earlier by Hispanic Tester 1, on Riverside Drive (one block away). Black Tester 4 exited the NYC Rooms For Rent, Inc., office.

149.    On or about June 7, 2008, two fair housing testers conducted an investigation of the housing practices of NYC Rooms for Rent, Inc.

150.    White Tester 2 entered NYC Rooms for Rent, Inc., and told the employee, who identified himself as "Jose", that he wanted a room in Manhattan. Jose provided him with the addresses of five rooms in Manhattan, on 145th, 147th, 149th, 151st, and 160th Streets. When White Tester 2 pressed Jose for more room locations, he replied "all over, I said [West] 145th [Street] and up, all over." White Tester 2 then left the NYC Rooms for Rent, Inc. office.

151.    Black Tester 5 then entered NYC Rooms for Rent, Inc., and told Jose that he wanted a room in Manhattan or the Bronx. Jose told him "we have rooms all over Manhattan, not, Manhattan is limited, $150 a week, we might have a couple options, but all over the Bronx." The rooms Jose offered to White Tester 2 were all withheld.

152.      Upon information and belief, NYC Rooms for Rent, Inc., engages in spamming on Craigslist. For example, on May 20, 2008, a search of Craigslists' New York City housing list revealed approximately 220 NYC Rooms for Rent, Inc., listings, and on June 1, 2008 a Craigslist search revealed approximately 130 NYC Rooms for Rent, Inc., listings. Another search, on August 15, 2008, revealed 150 listings.

153.      Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27). The high volume of links gives customers the impression that NYC Rooms for Rent, Inc., is a leader in the industry and a reliable, legitimate business. The high volume of links also squeezes out NYC Rooms for Rent, Inc.'s reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc. and Santos Realty Inc. by overwhelming the legitimate and non-identical listings they post.

154.      As well as spamming, NYC Rooms for Rent, Inc., engages in other deceptive practices. In April, May, and June 2008, NYC Rooms for Rent, Inc.'s Craigslist postings included claims that NYC Rooms for Rent, Inc., was the "only licensed agency in NYC," "the only agency with a valid NYS license!!!," that NYC Rooms for Rent, Inc., had "17 years experience" or "15 years experience," and claimed that "as seen before in the Daily News, we are the most reliable agency in NYC." Upon information and belief, each one of these claims is an outright falsehood, intended to deceive unsuspecting room seekers into the hands of NYC Rooms for Rent, Inc., unlawful business. The Daily News never ran a positive story about NYC Rooms for Rent, Inc., and instead removed the NYC Rooms for Rent, Inc., advertising in response to numerous complaints.

K.  Misconduct by Defendants nygorealty.com and Square Four Realty

38

155.     Upon information and belief, nygorentals.com is owned by Leroy Noel Cox ("Cox"). Upon information and belief, Cox also utilizes Square Four Realty as an alter ego for nygorentals.com. Neither Cox, nygorentals.com, nor Square Four Realty is licensed as an AIV by the Department of State.

156.     On or about August 8, 2001, the New York Attorney General brought criminal charges against Cox and others for charging consumers fees to rent non-existent apartments. The NYAG's press release indicated that after a prior civil suit was brought against him by the NYAG in 1999, Cox had agreed to never again act as an AIV.

157.     On or about August 30, 2008, Square Four Realty posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included: "a perfect share," "perfect for shares or professionals," "perfect for shares or a [sic] couples." On or about September 21 , 2008, nygorentals.com posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist. Such phrases included: "great for a couple or shares," "perfect for a single person," "sharable." The words "share," "shares," "sharable," "single person," and "couples" are all facially discriminatory and violate the familial status provision of the Fair Housing Act. The word "professionals" is also facially discriminatory and violates the disability provision of the Fair Housing Act.

158.     Upon information and belief, nygorentals.com and Square Four Realty engage in spamming on Craigslist. For example, on September 7, 2008, a search of Craigslists' New York City housing list revealed approximately 250 nygorentals.com and Square Four Realty listings, and on August 17, 2008, a Craigslist search revealed approximately 120 nygorentals.com listings.

159.    Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27).  The high volume of links gives customers the impression that nygorentals.com and Square Four Realty are leaders in the industry and are reliable, legitimate businesses.  The high volume of links also squeezes out nygorentals.com and Square Four Realty's reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc. and Santos Realty Inc. by overwhelming the legitimate and non-identical listings they post.

L.    Misconduct by Defendant Rentasy Rentals, Inc.

160.    Upon information and belief, Rentasy Rentals, Inc., is owned by Esterlin Martinez ("Martinez").  Martinez was formerly licensed by the Department of State as an AIV but his license expired on October 31, 2005.  Rentasy Rentals, Inc., is not licensed as an AIV.

161.    On or about April 16, 2008 witness William Watkins went to Rentasy Rentals, Inc., and paid a fee of $175 for apartment sharing services.  Watkins found out about Rentasy Rentals, Inc., on Craigslist.  As of May 30, 2008, Rentasy Rentals, Inc., had not referred Watkins to a single apartment.

162.    On or about May 10, 2008, witness Denis Wotton ("Wotton") went to Rentasy Rentals, Inc., and paid an individual there, "Omar," a fee of $200 for apartment sharing services.  Wotton found out about Rentasy Rentals, Inc., on Craigslist.  Omar sent Wotton to two apartments purportedly available for rent; at the first he waited two hours before discovering that no-one was there to show him the room, and at the second the man who answered said he had no room to rent and that he had never heard of Omar. Omar and Rentasy Rentals, Inc., refused to refund Wotton's fee.

163.    On or about May 14, 2008, witness Jesse Pope ("Pope") went to Rentasy

Rentals, Inc., and paid Omar a fee of $200 for apartment rental services. Pope found out

about Rentasy Rentals, Inc., on Craigslist. Omar sent Pope to two apartments

purportedly available for rent; the first address was a basement with nothing but locked

doors that appeared to be storage, and at the second the superintendent said the room was

not for rent.

164.    Since 2005 several similar complaints against Rentasy Rentals, Inc., have

been filed with the Department of State. Rentasy Rentals, Inc., has also been sued in the

Southern District of New York for discriminating against a prospective renter on the

basis of disability, *Hahn v. Domy Rooms, Inc. and Rentasy Rentals, Inc.*, 07 CIV 8013

(DAB).

165.    In or about May 2008, Rentasy Rentals, Inc. posted numerous housing

advertisements containing facially discriminatory words or phrases on Craigslist. Such

phrases included: "Students and couples are welcomed," "Parejas son Bienvenidas,"

[Couples are welcomed] "rent for one person from $125-$150; couples from $150-$175

and up," "$125-$150 for singles $150-$175 for couples." The words "singles,"

"couples," and "Parejas" are facially discriminatory and violate the familial status

provision of the Fair Housing Act.

166.    On or about June 1, 2008, three fair housing testers conducted an

investigation of the housing practices of Rentasy Rentals, Inc.

167.    Hispanic Tester 1 entered Rentasy Rentals, Inc.'s office and told the

employee at the counter, "Omar," that she had a room to rent for $115 per week for a

single person, $150 for a couple, and that she wanted someone Dominican or White, but

no Blacks.  Hispanic Tester 1 also declared that she did not want any children, and no recent Dominican immigrants.  Omar agreed, stating "not Platano," [recent immigrants] "no Morenos" [Blacks].  Hispanic Tester 1 gave the address 3495 Broadway, between West 142nd and 143rd Streets, for the location of the apartment.  Hispanic Tester 1 then left the Rentasy Rentals, Inc.'s office.

168.      Black Tester 4 then entered Rentasy Rentals, Inc.'s office and asked for a room near the 145th Street Subway booth, saying he needed to be near work and his mother.  Omar referred Black Tester 4 to a room on West 145th and Adam Clayton Powell Boulevard, approximately three-quarters of a mile from the location  Black Tester 4 asked for.  The room listed by Hispanic Tester 1 was not mentioned.  Omar also told Black Tester 4 that the Rentasy Rentals, Inc., fee is $200, but that Omar would reduce it to $175.  Black Tester 4 again stated that he wanted to remain close by his mother, but the Hispanic Tester 1 listing was withheld a second time.

169.      After Black Tester 4 left, White Tester 1 entered Rentasy Rentals, Inc.'s office and asked for a room nearby.  Omar offered White Tester 1 the room on Broadway between West 142nd and 143rd Streets, listed earlier by Hispanic Tester 1.  Omar also told White Tester 1 that the Rentasy Rentals, Inc., fee was only $150.

170.      Upon information and belief, Rentasy Rentals, Inc., engages in spamming on Craigslist.  For example, on May 20, 2008, a search of Craigslists' New York City housing list revealed approximately 425 Rentasy Rentals, Inc. listings, and on June 1, 2008 a Craigslist search revealed approximately 175 Rentasy Rentals, Inc. listings.  Another search, on August 15, 2008, revealed 140 listings.

171.      Spamming is prohibited by Craigslist's Terms of Use (supra, ¶ 27).  The high volume of links gives customers the impression that Rentasy Rentals, Inc., is a leader in the industry and a reliable, legitimate business.  The high volume of links also squeezes out Rentasy Rentals, Inc.'s reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical listings they post.

172.      As well as spamming, Rentasy Rentals, Inc., engages in other deceptive practices.  In May and June 2008, Rentasy Rentals, Inc.'s Craigslist postings included claims that Rentasy Rentals, Inc., had "hundreds of rooms available today," "no deposits required to rent," "licensed and certified by the State of new York," "no service fee charge or brokers fee to rent a room," and "We are the largest rental service provider in the city."   Upon information and belief, each one of these claims is an outright falsehood, intended to deceive unsuspecting room seekers into the hands of Rentasy Rentals, Inc.'s unlawful business.  Upon information and belief, in September 2008 Rentasy Rentals, Inc., also posted pictures of luxurious hotel rooms on their Craigslist posting in order to mislead potential customers.

M.  Misconduct by Defendant Sool Realty Corp.

173.      Upon information and belief, Sool Realty Corp. is owned and operated by Sylvia Wiesner ("Sylvia").

174.      Between March 31, 2008 and September 6, 2008, Sool Realty Corp. posted numerous housing advertisements containing facially discriminatory words or phrases on Craigslist.  Such phrases included: "excellent for a couple," "ideal for roonmated [sic] or young couple started out," "excelleent [sic] for a couple or single

person," "Mostly for a single person, students welcomed and hard working people welcomed, couples optional," "for one single person only … no exceptions please," "good for a single person or a couple," and "singles or couple okay." The words "couple," and "rommates," and the phrases "young couple starting out," and "single person," are all facially discriminatory and violate the familial status provision of the Fair Housing Act. "Hard working people" is also facially discriminatory and violates the disability provision of the Fair Housing Act.

175.    On or about September 5, 2008, three fair housing testers conducted an investigation of the housing practices of Sool Realty Corp.

176.    White Tester 1 entered Sool realty Corp.'s offices and informed the employee, Rocio Wiesner ("Rocio"), that he had a room to rent for $125 a week located one block form the Sool realty Corp. office, that he wanted someone who spoke Spanish and that he didn't want a child. Wiesner said "ok" and wrote the information down. White Tester 1 then left the Sool Realty Corp. offices.

177.    Black Tester 4 then entered Sool Realty Corp.'s offices, and asked for a room within five or six blocks of his present location for $175 a week or less. After speaking with several individuals, including Sylvia and Rocio, and filling out paperwork, Black Tester 4 was offered a room in Briarwood, twenty minutes east of the Sool Realty Corp. office. The much closer listing placed by White Tester 1 was withheld.

178.    After Black Tester 4 left Sool Realty Corp.'s offices, Hispanic Tester 1 entered and asked for a room in the immediate area. Sylvia offered Hispanic Tester 1 three local rooms, including the room listed by White Tester 1. All three were withheld from Black Tester 4. Hispanic Tester 1 then left Sool Realty Corp.'s offices.

179.    On or about September 8, 2008, four fair housing testers conducted an investigation of the housing practices of Sool Realty Corp.

180.    Whit Tester 1 returned to Sool Realty Corp.'s offices and told the employees there that he was available to show his room for rent. At the same time, Hispanic Tester 1 entered Sool Realty Corp.'s offices and told the employees that she was interested in the room she had been told about on 72nd Street (White Tester 1's listing). Hispanic Tester 1 asked White Tester 1 if she could get a lease on the room, and was told she could not. Hispanic tester 1 and White tester 1 then left Sool Realty Corp.'s offices.

181.    Black Testers 1 and 3 then entered Sool Realty Corp.'s offices, and told the employees that they needed two separate rooms in the area.    After filling out forms (Sool Realty Corp. required only the Black testers to fill out any paperwork), they were told that rooms were available in Richmond Hill, but they insisted on something in the current neighborhood.

182.    While the Black testers were filling out forms, a Sool Realty Corp. employee (out of earshot of the Black testers) called White Tester 1 to see if one of them could have his room. When White Tester 1 learned the applicants are Black, he says "yea, I don't want any Black people. . . . "

183.    As a result of the call, the White Tester 1 listing (along with the other listings offered to Hispanic Tester 1) were withheld from Black Testers 1 and 3.

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF 42 USC § 3604(c): DISCRIMINATORY ADVERTISING (against all defendants except Easy Room Rentals)**

184.     Plaintiffs repeat and reallege paragraphs 1 through 183 of this complaint as if fully set forth herein.

185.     Defendants violated 42 USC § 3604(c) by posting advertisements on Craigslist for the rental of dwellings, as defined by 42 USC § 3602(b), that indicated preferences, limitations, and discrimination based upon religion, handicap, or familial status.

186.     The discriminatory actions of defendants were intentional, willful, and or negligent, and taken in disregard of the Fair Housing Act, plaintiffs' rights, and the rights of protected persons.

## SECOND CLAIM FOR RELIEF FOR VIOLATION OF 42 USC § 3601(f)(1): REFUSAL TO RENT and/or RACIAL STEERING (against all defendants except City Rooms, Inc., MyNewRoommate, Inc., and nygorentals.com)

187.     Plaintiffs repeat and reallege paragraphs 1 through 186 of this complaint as if fully set forth herein.

188.     Defendants violated 42 USC § 3601(f)(1) by denying plaintiffs services and/or by denying them access to specific apartments based upon race, color, or national origin.

189.     The discriminatory actions of defendants were intentional, willful, and or negligent, and taken in disregard of the Fair Housing Act, plaintiffs' rights, and the rights of protected persons.

## THIRD CLAIM FOR RELIEF FOR VIOLATION OF THE NEW YORK REAL PROPERTY LAW, ARTICLE 12-C: ENGAGING IN THE BUSINESS OF AN AIV WITHOUT A LICENSE (against all defendants except NYC Rooms for Rent, Inc. and Sool Realty Corp.)

190.     Plaintiffs repeat and reallege paragraphs 1 through 189 of this complaint as if fully set forth herein.

191.     Defendants violated Real Property Law § 446-b(1) by engaging in the business of an AIV and by collecting fees for that activity and/or by falsely holding themselves out as being licensed by the Department of State, without being so licensed.

192.     Defendants' unlawful actions were intentional, willful, and/or reckless and taken in disregard of New York law and of the rights of plaintiffs.

### FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF THE NEW YORK HUMAN RIGHTS LAW: DISCRIMINATORY ADVERTISING, REFUSAL TO RENT, and/or RACIAL STEERING

193.     Plaintiffs repeat and reallege paragraphs 1 through 192 of this complaint as if fully set forth herein.

194.     Defendants violated New York Executive Law § 296(5)(a)(1) by denying plaintiffs services and/or by denying them access to specific apartments based upon race, color, or national origin.

195.     Defendants violated Defendants violated New York Executive Law § 296(5)(a)(1) by posting advertisements on Craigslist for the rental of dwellings, which indicated preferences, limitations, and discrimination based upon religion, handicap, or familial status.

196.     The discriminatory actions of defendants were intentional, willful, and or negligent, and taken in disregard of the New York Human Rights Law, plaintiffs' rights, and the rights of protected persons.

47

**FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW: DISCRIMINATORY ADVERTISING, REFUSAL TO RENT, and/or RACIAL STEERING**

197.     Plaintiffs repeat and reallege paragraphs 1 through 196 of this complaint as if fully set forth herein.

198.     Defendants violated New York City Administrative Code § 8-107 by denying plaintiffs services and/or by denying them access to specific apartments based upon race, color, or national origin.

199.     Defendants violated New York City Administrative Code § 8-107 by posting advertisements on Craigslist for the rental of dwellings, which indicated preferences, limitations, and discrimination based upon religion, handicap, or familial status.

200.     The discriminatory actions of defendants were intentional, willful, and or negligent, and taken in disregard of the New York City Human Rights Law, plaintiffs' rights, and the rights of protected persons.

**SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW: FALSE AND DECEPTIVE ADVERTISING PRACTICES**

201.     Plaintiffs repeat and reallege paragraphs 1 through 200 of this complaint as if fully set forth herein.

202.     Defendants (other than NYC Rooms For Rent, Inc.) violated General Business Law § 349 by engaging in the business of an AIV and collecting fees for AIV services without the required license from the Department of State. By advertising themselves openly as AIV's, defendants give customers the false impression that they are

licensed by the Department of State, and that they are reliable, legitimate businesses. Some defendants affirmatively lie about their licensing status.

203. Defendants violated General Business Law § 349 by spamming on Craigslist. Spamming gives customers the impression that defendants have many more rooms available than is actually the case. The high volume of links also squeezes out defendants' reputable, licensed competitors, such as plaintiffs ABC Real Estate Services, Inc., and Santos Realty, Inc., by overwhelming the legitimate and non-identical listings they post.

204. Defendants violated General Business Law § 349 through false statements in the advertisements they post on Craigslist. These false statements include defendants' status as industry leaders, testimonials defendants have received, the number of rooms defendants have for rent, that no deposits or other fees are required, and posting pictures of hotel rooms on their advertisements.

### SEVENTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS FOR VIOLATION OF CRAIGSLIST'S TERMS OF USE

205. Plaintiffs repeat and reallege paragraphs 1 through 204 of this complaint as if fully set forth herein.

206. Defendants violated Section 7 of Craigslist's Terms of Use by posting advertisements for the rental of dwellings on Craigslist that violated the Fair Housing Act by indicating preferences, limitations, and discrimination based upon religion, handicap, or familial status. Plaintiffs suffered injury that Craigslist's Terms of Use were intended to prevent.

207. Defendants violated Section 7 of Craigslist's Terms of Use by posting advertisements for the rental of dwellings on Craigslist that were false, deceptive,

misleading, deceitful, and misinformative, in that they misrepresented the defendants'
licensing status or other facts about their businesses.  Plaintiffs suffered injury that
Craigslist's Terms of Use were intended to prevent.

208.     Defendants violated Section 7 of Craigslist's Terms of Use by posting
advertisements for the rental of dwellings on Craigslist that negatively affected plaintiffs'
ability to use Craigslist in that defendants engaged in spamming.  Plaintiffs suffered
injury that Craigslist's Terms of Use were intended to prevent.

209.     Defendants' violations of Craigslist's Terms of Use were intentional,
willful, and/or reckless.

210.     By posting advertisements on Craigslist, defendants entered into valid
agreements with Craigslist and agreed to be bound by Craigslist's Terms of Use.
Furthermore, Craigslist intended, and by posting advertisements on Craigslist, Plaintiffs
and defendants intended that Plaintiffs, as users of Craigslist, would be third-party
beneficiaries of the agreements between Craigslist and defendants.  As such, Plaintiffs are
entitled to enforce the agreements between Craigslist and defendants.

**WHEREFORE**, plaintiffs respectfully request judgment against the defendants
as follows:

(A)     declaring that defendants' discriminatory advertising practices and
business practices violate the Fair Housing Act, 42 USC §§ 3601 *et seq.*, the New York
Human Rights Law, New York Executive Law §§ 290 *et seq.*, and the New York City
Human Rights Law, New York City Administrative Code Title 8;

(B)     declaring that defendants' spamming and posting of misleading advertisements violates  New York General Business Law § 349 and Craigslist's Terms of Use;

(C)     enjoining defendants, their agents, employees, and successors, as well as all other persons who act in concert or participation with any of them, from (i) carrying out the business of an AIV without being properly licensed by the Department of STate, (ii) discriminating against any person on the basis of color, race, religion, disability, familial status, or religion in renting apartments, and (iii) posting advertisements for apartment rentals on Craigslist;

(D)     awarding such damages as will compensate plaintiffs for the damages caused by defendants' violations of the Fair Housing Act and New York STate and City law;

(E)     awarding plaintiffs punitive damages pursuant to 42 USC § 3613(c), New York Executive Law § 297(9), and the New York City Administrative Code § 8-502; and

(F)     awarding plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 USC § 3613(c), New York Executive Law § 297(10), New York City Administrative Code § 8-502, and New York General Business Law § 349(g).

Dated:    New York, New York
          October 17, 2008

SCHLAM STONE & DOLAN LLP

By: _____

Jeffrey M. Eilender (JE 8250)
Niall D. O'Murchadha (NO8161)
26 Broadway
New York, New York 10004
(212) 344-5400
*Attorneys for Plaintiffs*

51